THE STATE v. W. E. RIPPEY, Appellant.

Division Two, May 26, 1910.

1. HEARSAY: No Objections. If no objections were made and no exceptions were saved, statements made by the prosecuting witness of what others had said to him cannot on appeal be held to have been wrongfully admitted in evidence.

2. NEW TRIAL: Newly Discovered Evidence: Ignorance of Right to Testify. Before the court should grant a new trial on the ground of newly-discovered evidence it must appear that the de-

fendant did not know of the evidence in time to use it on the trial. And where defendant was indicted for marking and branding a steer, the property of another, with the felonious intent to convert him to his own use, and before the trial the steer had been taken from him in a replevin suit, and in his affidavit in support of his motion for a new trial he states his wife and daughter were not permitted to testify in that suit, and he supposed they would not, therefore, be permitted to testify in this, and for that reason had not subpoenaed them as witnesses, yet the record shows that the court appointed counsel to defend him and no application for a continuance was made, the trial court did not commit reversible error in overruling the motion.

3. ———: ———: **Material.** The newly-discovered evidence should be so material that it would probably produce a different result if a new trial were granted; and whether or not it is of that materiality is largely a question for the trial court.

Appeal from Pulaski Circuit Court.—*Hon. L. B. Woodside,* Judge.

AFFIRMED.

*Elliott W. Major,* Attorney-General, and *John M. Dawson,* Assistant Attorney-General, for the State.

(1)   Only two instructions were given to the jury on behalf of the State. Instruction 1 embraced all of the elements contained in the indictment and properly marked out the punishment as by the statute provided. R. S. 1899, sec. 1898 and 1903; State v. Price, 186 Mo. 140.   (2)   Instruction 2, on the part of the State, told the jury that the defendant was a competent witness in his own behalf, but that the jury might, in weighing his testimony, take into consideration the fact that he was the defendant on trial. This instruction contained no objectionable features.   (3)   The court instructed upon reasonable doubt in defendant's second instruction, and that is sufficient. Appellant made no request that the court instruct upon all the law of the case. State v. Finley, 193 Mo. 202. If defendant desired instructions on any particular subject he should

have requested them. State v. Graves, 194 Mo. 452. (4) In order for the appellant to obtain a new trial on newly-discovered evidence, he must show, first, that the evidence has come to his knowledge since the trial; second, that it was not owing to the want of due diligence that it did not come sooner; third, that it is so material that it would probably produce a different result if a new trial were granted; fourth, that it is not cumulative only; fifth, that the affidavit of the witness himself can be produced or its absence accounted for; and, sixth, that the object of the testimony is not merely to impeach the character or credit of a witness. State v. Speritus, 191 Mo. 42; State v. Thurman, 121 Mo. App. 377; State v. McKenzie, 177 Mo. 699; Berry v. State, 10 Ga. 527; State v. McLaughlin, 27 Mo. 112. The appellant has not shown due diligence; and the appellant does not show that the newly-discovered evidence is so material that it would produce a different result if a new trial were granted. However, as to the last there is sometimes a difference of judicial opinion, but as to the first there can be no question. State v. McCullough, 171 Mo. 571; State v. Finn, 199 Mo. 604; State v. Smith, 65 Mo. 313; State v. Myers, 115 Mo. 394; State v. Miller, 144 Mo. 26; State v. Allen, 171 Mo. 562; State v. Reynolds, 171 Mo. 552.

GANTT, P. J.—At the March term, 1909, the grand jury of Pulaski county returned an indictment against the defendant, charging him with having on or about the 7th of December, 1908, at the said county, unlawfully and feloniously placed and affixed his own brand upon a certain light red steer, the property of one G. W. Berry, and altered the mark of the said animal, with the intent then and there feloniously to steal and convert the said steer to his own use. The indictment is drawn under section 1903, Revised Statutes 1899, and sufficiently charges the offense.

The defendant was duly arrested and arraigned and entered his plea of not guilty. It appears that the circuit court appointed counsel to defend him. At the September term, 1909, of the Pulaski Circuit Court, the defendant was put upon his trial and convicted. He is not represented by counsel in this court save and except by typewritten brief filed under rule of the court.

The testimony on the part of the State tended to show that in September, 1908, G. W. Berry, the prosecuting witness, resided in the southern part of Pulaski county; that in September he bought seven head of yearling steers from one Dick Jones, and they were all marked with a split in each ear and not otherwise marked or branded; that Berry wintered the cattle through the winter of 1907 and 1908, and in the spring of 1908, between the 15th and the 20th of April, he marked these cattle, which he had bought of Jones, with his own ear mark, which was a crop and a split in each ear of the cattle. He also cut the end off of both ears. He also marked his cattle by putting his label in the upper part of the right ear, and after so marking the cattle he turned them out upon the commons or range. About the middle of the summer of 1909 he sold his cattle, but when he came to gather them up from the range he could not find the light red steer, the alleged felonious branding and marking of which constitutes the basis of this prosecution.

It appears from the evidence that the defendant had moved upon the farm which had been occupied by Dick Jones, and was living there at the time the controversy arose over the ownership of the steer. In November, 1908, one Ben Poston claimed that he had seen one of Berry's steers with defendant Rippey's cattle, and that this steer still had the label of Berry in its ear and also had the ear marks of Berry. From information received from Poston, Berry went to Rippey's home and inquired about his lost steer and the

defendant replied that he had not seen it. Berry testified that he went again when Rippey, the defendant, was not at home, and that he found his steer, or one that he identified as his, with Rippey's cattle, and that the ear mark had been recently made on his ear. He testified that some three or four days previous to the date on which he identified his steer in defendant's pasture, he attended a sale and saw Rippey, the defendant, buy some cattle; that he went to the home of the defendant and talked with the defendant's wife and inquired about his steer and she said it was not there. He went again to Rippey's house and found that the cattle which the defendant had recently bought were fresh-branded. Thereupon Berry replevied the steer in the justice's court, and upon a trial Berry was adjudged the owner of the steer. Thereupon the grand jury indicted the defendant.

Berry testified that the hole which he had made in the ear of the steer for his label was still in the ear of the animal, but defendant had changed the label and put it in the left ear, and the defendant's brand B was on the left hip of the steer. He testified that in his opinion it was his steer, but there might possibly be two steers exactly alike, but he did not think so. From the make up of the steer and marking or label, he was thoroughly satisfied it was his steer. On cross-examination he testified that from the time he turned the steer out on the range in April he did not see it any more until November. He testified that he inquired from the defendant where he got the steer and the defendant said he bought it from Hancock. The State also offered S. P. Jones as a witness who testified that he had sold a red steer to Berry, the prosecuting witness, and he identified the steer in the defendant's pasture as the one he had sold to Berry. Other witnesses testified that in their opinion the steer was the property of the prosecuting witness.

The defendant testified in his own behalf that he bought some cattle from Orval Brown, among others the steer in controversy. That when the prosecuting witness and some others came to his house he did not know they were after the steer. Mr. Berry told him that he had found a steer on defendant's place that he thought was his, but defendant said, "I guess not." He testified he had bought the cattle, and he asked Berry to leave them there until morning, and give him a chance to prove where he got the steer, but Berry said, "No, I have come to take him and I am going to take him to-night." "He asked me where I got it, and I do not know for sure whether I got him from Orval Brown or Hancock. When they took the steer, I went to Crocker and called up Mr. Hancock, but after talking with Hancock, I concluded I must have gotten it from Mr. Brown." Thereupon, he requested Mr. Brown to go home with him and pick out the cattle which Brown had sold him. He had bought five from Brown, and Brown found four of them on his place, but said one of the number he had sold him was missing. Thereupon he and Brown went to Berry's and Brown identified the steer in controversy, as the one which he had sold the defendant. He testified to labeling and branding his cattle after he had bought them. He explained why he did not mark all the cattle at one time—because his chute was not large enough to hold them all at once. He testified that he wintered and pastured this steer until Berry came and got him. He did not know Berry's mark, but when he bought this steer he tried to put it in his own mark. He got it from Mr. Brown, and that by the result of the replevin suit he was short one steer. He testified that he honestly believed that it was his steer, and that if it was not he was honestly mistaken. His testimony also was that he lived only about three or four miles from where Berry lives.

The court instructed the jury that if they found that on or about the 7th of December, 1908, the de-

fendant in said county did willfully alter the mark upon a steer, charged in the indictment, with the fraudulent intent to steal the said steer, and convert it permanent- ly to his own use, against the will of the owner and deprive the owner permanently, and against his will of the use thereof, and knowing that it was not his own, and that the said steer was at the said time and place the property of the G. W. Berry, they would find the defendant guilty of grand larceny. The court also instructed the jury that the defendant was a competent witness in his own behalf, in the ordinary formula.

On the part of the defendant the court instructed the jury that although they might find from the evi- dence that the defendant changed the mark on the steer and that it was not his own steer, yet, if he believed that it was his own steer and changed the mark under that belief, it would not be larceny, and they should acquit him. The court also gave the usual instruction on the presumption of innocence and on reasonable doubt.

Under the instructions of the court and the evi- dence the jury found the defendant guilty and assessed his punishment at imprisonment in the penitentiary for two years.

I.    The first assignment of error is that the court permitted the witness Berry to give hearsay state- ments that were very detrimental to the defendant. We have read this whole record very carefully and the witness Berry did make statements of what Mr. Wingo and others had said to him, but we find no objection whatever and no exceptions saved on this account, and therefore this alleged error cannot avail the defendant in this court.

II.    The defendant urgently prays for a new trial on the ground of newly-discovered evidence. Among the witnesses whose evidence he desired were his wife, daughter and Orval Brown. In explanation of why he

did not have his wife present to testify in his behalf, he states in his affidavit in support of his motion for new trial, that the court refused to permit her to testify in  the replevin suit between Berry and himself for the possession of this steer, and being an ignorant man he thought that she could not testify in this case, and therefore he did not have her subpoenaed or bring her to court, and the same is true in regard to his daughter.   Mrs. Rippey in support of her husband's application for new trial on account of her absence, states in her affidavit that she is the wife of the defendant; that she knows the particular steer in question claimed by the prosecuting witness G. W. Berry, and knows that this steer had been owned by her said husband and in his actual possession more than a year prior to the 7th of September, 1908; that she herself wrote the check for the payment of the same sometime in the year 1907; that she was present and assisted her husband in branding this identical steer more than one year prior to December, 1908, and that said brand became dim, and she assisted her husband to rebrand this particular steer with the other steers, and to relabel him, and that she is positive that at no time was the label of G. W. Berry ever in the ear of this particular steer, and that she assisted her husband in feeding and caring for this steer during the winter of 1907.   She is not mistaken as to the identity of the steer.   The affidavit of Orval Brown states that he is acquainted with the defendant W. E. Rippey, and that he sold Rippey five steer calves in the spring of 1907; that the defendant's wife wrote the check, and that he saw the steer in question in Mr. Berry's pasture, and that prior to seeing him in the said pasture he looked for the five calves to see if he could identify them as the calves which he had previously sold to the defendant, and that after this question of title to this steer arose he went and looked for said calves and that he could identify two of them to a reasonable

certainty, but he could not find the fifth calf, and he went to Mr. Berry's pasture and there found the steer in question, which very much resembled one of the calves that he sold the defendant as above stated, and that its color resembled the one that he let defendant have.

Surely by the ordinary rule the defendant has shown little or no diligence whatever to procure the evidence of his wife and daughter or Orval Brown. It is probably true that, owing to the fact that he had not employed any attorney to advise him, he was ignorant of the importance of their testimony in his case. But the court appointed counsel for him, and it would seem that the most ordinary diligence would have suggested an application for a continuance until he could have procured these witnesses, all of whom seem to have resided in the same county and their affidavits were secured in time for a motion for new trial. The courts generally are reluctant to grant new trials upon the ground of newly-discovered evidence. In this State it has been almost invariably ruled that before a court should grant a new trial on the ground of newly-discovered evidence it must appear that the party did not know of the evidence in time to use it on the trial. Obviously this could not apply to Mr. Brown or to the defendant's wife, as he knew in both instances before the trial what their testimony would be, and obviously he could not show that he could not by diligence have discovered it in time for the trial.

In the third place it is required that such evidence should be so material that it probably would produce a different result if a new trial were granted. This ground appeals especially, we think, to the judge who heard the case, as he would be in a much better position to judge of the probabilities of a different result if the testimony could be procured. While it is true the defendant files the affidavit of Mr. Brown, showing that he had sold the defendant five calves,

and that the steer over which this controversy has arisen was very much like one of the calves that he sold the defendant, this witness also testified on the hearing of a motion for new trial that all the calves that he sold Rippey had horns; that he did not examine this steer at Berry's close enough to see whether it had horns or not, but all the other testimony on the part of the State tended to show that the steer for which the defendant was indicted was a muley, so that upon the consideration of this application for a new trial we see no ground for interfering with the judgment of the circuit court in denying the same. [State v. McLaughlin, 27 Mo. 112; State v. Finn, 199 Mo. 604.]

The instructions of the court covered all the propositions of law arising upon the evidence, and there was sufficient evidence, if believed by the jury, to sustain their verdict, and that verdict met the approval of the trial judge, and under these circumstances this court must defer to the judgment of the jury upon the evidence. We have been unable to find any reversible error in the record and accordingly the judgment must be affirmed. All concur.